IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA

| | | |
|---|---|---|
| MELISSA DEVIN MAGNESS | : | CIVIL ACTION |
| | : | |
| v. | : | |
| | : | |
| WALLED LAKE CREDIT BUREAU, LLC, et al. | : | NO. 12-6586 |
| | : | |

ORDER

AND NOW, this 18th day of February 2014, upon consideration of Defendants' Motions for Summary Judgment and statements of undisputed facts (Doc. Nos. 45, 46 & 48), Plaintiff's Omnibus Response (Doc. No. 59), and Defendants' Replies thereto (Doc. Nos. 65 & 66), it is hereby ORDERED that the motions are GRANTED in part and DENIED in part as follows:

1. Defendants' motions are DENIED with respect to Count I of Plaintiff's Amended Complaint (Doc. No. 15).
2. Defendants' motions are GRANTED with respect to Count II of Plaintiff's Amended Complaint, as discussed below.

I. Factual Background[1]

In June 2011, Plaintiff Melissa Magness acquired a loan from Defendant Bank of America, N.A. (Bank of America) in order to purchase her home. (Doc. Nos. 48, at ¶ 1 & 59-2, at ¶ 1.) Thereafter, Bank of America mailed monthly mortgage statements to Plaintiff's father's P.O. Box. (Doc. No. 59-7, at 15 (Pl.'s Dep. 54:21-56:24).) Plaintiff is solely responsible for her mortgage; she works for her father, Ben Magness (Magness), and he pays her mortgage as part of her employment compensation. (Id. at 4, 16, 35 (Pl.'s Dep. 10:20-23, 57:12-16, 133:19-134:11).) While living in her home, Plaintiff had a roommate for approximately six months, and

---

[1] In determining whether a party has carried its burden, the Court must "view the facts in the light most favorable to the non-moving party and draw all reasonable inferences in that party's favor." S.H. ex rel. Durrell v. Lower Merion Sch. Dist., 729 F.3d 248, 256 (3d Cir. 2013). Page references reflect the page number assigned by ECF.

1

Plaintiff contributed the roommate's rent payments to her mortgage. (Id. at 3, 23 (Pl.'s Dep. 8:1-3, 88:12-24).) In March 2012, Plaintiff's home flooded. (Id. at 3, 25 (Pl.'s Dep. 8:4-11, 93:10-21).) To avoid paying higher homeowners insurance premiums, Plaintiff changed homeowners insurance companies. (Id.) In June 2012, Bank of America paid premiums from Plaintiff's escrow account to both her old and new insurance companies, resulting in an escrow deficit. (Doc. Nos. 48, at ¶¶ 5-8 & 59-2, at ¶¶ 5-8.) Magness mailed a check to Bank of America in June, instructing it to allocate $1887.06 toward the monthly payment and $800 to principal; that check was insufficient to cover the escrow deficit. (Doc. Nos. 48, at ¶¶ 12-23 & 59-2, at ¶¶ 12-23.) With his July 20, 2012, check to Bank of America, Magness instructed the check be allocated as follows: $1887.06 for the monthly payment, $1600 for additional escrow, and $800 for additional principal. (Id.) In the interim, Plaintiff's monthly payment had increased to $2056.73, so the check did not satisfy the monthly payment. (Id.) Although Magness sent Bank of America a check dated August 1, 2012, for $300, the payment went to Plaintiff's escrow instead of satisfying the August payment. (Id.) Magness's September payment did not post until September 5, 2013. (Id.)

Between August 18 and September 5, 2012, Bank of America called Plaintiff 34 times; Bank of America records reflect that 32 of these calls were placed to Plaintiff's previous employer, and they all went to voice mail. (Doc. Nos. 48, at ¶¶ 34-35 & 59-2, at ¶¶ 34-35.) As of September 2, 2012, when Bank of America's "system" showed that Plaintiff had not made her August or September monthly payments, Bank of America instructed a third-party to mail at least one Borrower Response Package to Plaintiff. (Doc. Nos. 48, at ¶ 25 & 59-2, at ¶ 25.) It is disputed whether Walled Lake Credit Bureau, LLC (Walled Lake), the other defendant in this case, mailed the Borrower Response Package. (Id.; Doc. No. 59-11, at 31, 28 (Ralston Dep.

117:5-119:14, 107:7-20)).)  In late September, Bank of America called Plaintiff four times.  (Doc. Nos. 48, at ¶ 42 & 59-2, at ¶ 42.)

Attached to Plaintiff's Response is a Borrower Response Package that was addressed to Plaintiff at her father's P.O. Box.  (Doc. No. 59-9, at 2.)  The Borrower Response Package is a 32 page document with 16 pages of substantive text.  (Id. at 2-33.)  The cover letter is dated September 5, 2012, and it bears the Bank of America Home Loans logo in the upper-left hand corner; after the logo and the address, the larger left-hand portion of the cover letter states:

> Dear MELISSA DEVIN MAGNESS:
>
> We have not received your last two regularly scheduled payments and are concerned that you may be having difficulty making your mortgage payment. We want to make sure you are aware of the solutions that may be available to help you. It is important that you take action on this issue quickly, allowing your payments to become past due will put you at risk of losing your home to foreclosure.
>
> **We strongly encourage you to apply for assistance to avoid foreclosure.** Bank of America offers different programs to help keep you in your home including the Home Affordable Modification Program (HAMP), available to qualifying borrowers. If you must leave your home, we also have other options to help you avoid foreclosure such as a short sale or deed-in-lieu of foreclosure.
>
> **Please act quickly before your options become limited. Send us your Borrower Response Package with the requested financial information in the enclosed Homeowner Checklist by October 5, 2012.** We have included a pre-paid envelope for your convenience. If we do not receive your Borrower Response Package by October 5, 2012, we will continue normal activities for collecting past due loan payments up to and including referring your mortgage to foreclosure.
>
> It is important that you return your Borrower Response Package as soon as possible to take advantage of the greatest number of foreclosure alternatives that may be available to you.
>
> We want to help you avoid foreclosure, so please consider this opportunity.
>
> Home Loan Team
> Bank of America, N.A.

3

> ***P.S. We encourage you to call us if you are not interested in pursuing any of these foreclosure alternatives.  We may be able to limit future calls to collect on your account.***
>
> Enclosures: (1) Frequently Asked Questions (2) Homeowner Checklist (3) Important Notice to Help You Avoid Foreclosure (4) Uniform Borrower Assistance Form (5) IRS Form 4506-T (6) Non-Borrower Credit Authorization Form (7) Important Disclosures (8) Pre-paid return envelope
>
> If you are currently in a bankruptcy proceeding, or have previously obtained a discharge of this debt under applicable bankruptcy law, this notice is for information purposes only and not an attempt to impose personal liability for the debt. Please read the enclosed Frequently Asked Questions for more information.
>
> In order to expedite your review for loan assistance, Bank of America, N.A. is working with a third party company, Walled Lake Credit Bureau, LLC. Federal law requires that we communicate to you that Bank of America, N.A. is a debt collector and also that Walled Lake Credit Bureau, LLC is a licensed debt collector. However, the purpose of the communication is to let you know about your potential eligibility for a loan assistance program that may help you bring or keep your loan current through more affordable payments. Please see the enclosed insert for important disclosures from Walled Lake Credit Bureau, LLC.

(Id. at 2 (emphasis in original).)  The right hand panel of the cover letter contains lists under the

headings of "What You Need to Do" and "Helpful Resources."  (Id.)  The remainder of the

Borrower Response Package states, *inter alia*:

> **Q. Why did I receive this package?**
> You received this package because we have not received one or more of your monthly mortgage payments or because you have indicated that you have a hardship that may prevent you from making one or more of your monthly payments in the future.  (Id. at 4.)
> . . .
> **Q. Will it cost money to get help?**
> You should never pay a fee to obtain assistance or information about foreclosure avoidance options.  (Id.)
> . . .
> **Q. Will the foreclosure process begin if I do not respond to this letter?**
> Yes. Unless your loan is current or paid off, it is subject to foreclosure activity. If you have missed multiple monthly payments or there is reason to believe the property is vacant or abandoned, we may refer your mortgage to foreclosure regardless of whether you are being considered for a modification or other types of foreclosure alternatives.  (Id.)
> . . .

> **Q. Will my credit score be affected by my late payments or being in default?**
> If your loan is 30 days or more past due, your credit score may be affected. The delinquency status of your loan will be reported to credit reporting agencies . . . . (Id.)
> . . .
> **Walled Lake Credit Bureau, LLC** is a debt collector. Therefore, the following disclosures are required under various state and Federal law. However, we would like to reassure you that we have been retained to assist Bank of America, N.A. with its efforts to reach customers who may be eligible for a Home Affordable modification Program. The true purpose of these letters are [sic] to obtain a more affordable payment for you. (Id. at 32.)
>
> **IMPORTANT DISCLOSURES**
> This communication is from a debt collector attempting to collect a debt. Any information you provide **Walled Lake Credit Bureau, LLC** will be used for that purpose. This communication and the phone number listed above are operated by **Walled Lake Credit Bureau, LLC, 11802 Ridge Parkway, Ste 100 HRM. Broomfield, CO 80021.** . . . **Walled Lake Credit Bureau, LLC** is a third-party debt collection and home retention services company that has been duly authorized by Bank of America, N.A. to contact their borrowers and assist them with this program. (Id.)
>
> NOTICE REGARDING YOUR CURRENT DEBT
> **Bank of America, N.A.** services your mortgage. As of the date of this letter the amount necessary to bring your mortgage current is $2,137.56. (Id.)

The night that Plaintiff received the first Borrower Response Packages at her home, she and her father called Bank of America. (Doc. No. 59-7, at 18-19 (Pl.'s Dep. 66:15-17, 68:21-69:9).) The Bank of America representative told Plaintiff that Plaintiff's mortgage was up to date and that a "computer mixup" related to the two insurance payments had caused Plaintiff's mortgage to appear in arrears. (Id. at 19 (Pl.'s Dep. 69:21-71:7).) At some point during that call or a later call to Bank of America, the representative assured Plaintiff that she would stop receiving calls about loan modification. (Id. at 20 (Pl.'s Dep. 74:14-75:9).)

Plaintiff received a total of either three or four Borrower Response Packages—two to her home and one or two to her father's P.O. Box. (Doc. No. 59-7, at 18 (Pl.'s Dep. 65:8-14).) It appears that at least one of the Borrower Response Packages was not mailed until September 21,

5

2012.  (Doc. No. 59-15, at 2.)  Plaintiff was also called by individuals stating that they were "from" Bank of America.  (Id. at 10 (Pl.'s Dep. 35:6-12).)  It is unclear how many calls occurred—Plaintiff described in her deposition that the calls were "nonstop," occurring five to seven times per day, and that she let her voice mail fill up without clearing messages and she stopped answering her phone.  (Id. at 8, 9, 10 (Pl.'s Dep. 25:23-24, 30:21-31:1, 34:5-8).)  It does not appear that Plaintiff made a record of the calls but she said that the calls were "progressively worse and more and more aggressive" and that "there was a lot of torture."  (Id. at 8-9, 13 (Pl.'s Dep. 26:14-29:8, 46:8-24).)  In her deposition, Plaintiff testified that she did not remember any representative of Walled Lake or Bank of America having verbally asked her for money.  (Id. at 33 (Pl.'s Dep. 126:18-127:12).)  When asked about out-of-pocket expenses that she had incurred, Plaintiff stated that she had paid "a couple dollars" for street parking when she had visited her lawyer in October and that she had paid about $15 for a cab ride to the deposition and would likely pay for the cab ride home.  (Id. at 21 (Pl.'s Dep. 79:20-80:15).)

      This is a proposed class action suit.  In her Amended Complaint, Plaintiff alleges violations under the Fair Debt Collection Practices Act, 15 U.S.C. §§ 1692, et seq. (FDCPA) (Count I) and the Pennsylvania Unfair Trade Practices and Consumer Protection Law, 73 Pa. Stat. §§ 201.1, et seq. (UTPCPL) (Count II).  (Doc. No. 15, at 19-21.)  Plaintiff alleges that Defendants Bank of America and Walled Lake violated her rights under the applicable statutes by wrongfully informing Plaintiff that her mortgage was in default, threatening to foreclose on her home, and harassing her with a number of abusive oral and written communications.  (Id.)

II.     Standard of Review

Summary judgment is proper where "the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). A factual dispute is material if it could "affect the outcome of the suit under the governing law." Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248 (1986). A factual dispute is genuine if sufficient evidence exists that "a reasonable jury could return a verdict for the nonmoving party." Id. When considering a motion for summary judgment, this Court "view[s] the facts in the light most favorable to the nonmoving party and draw[s] all inferences in that party's favor." Stratechuk v. Bd. of Educ., S. Orange-Maplewood Sch. Dist., 587 F.3d 597, 603 (3d Cir. 2009) (quoting Norfolk S. Ry. v. Basell USA, Inc., 512 F.3d 86, 91 (3d Cir. 2008)) (quotation marks omitted).

The moving party bears the initial burden of identifying evidence showing an absence of a genuine issue of material fact. Celotex Corp. v. Catrett, 477 U.S. 317, 323 (1986). To satisfy its burden, the moving party need not "produce evidence showing the absence of a genuine issue of material fact"; rather, the moving party need only identify the "absence of evidence to support the nonmoving party's case." Id. at 325. Once the moving party has shown that there is an absence of evidence to support the nonmoving party's claims, the nonmoving party must "go beyond the pleadings and by [its] own affidavits, or by the depositions, answers to interrogatories, and admissions on file, designate specific facts showing that there is a genuine issue for trial." Id. at 324 (quotation marks omitted). If the party "fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden at trial," summary judgment should be granted. Id. at 322-23.

### III.    Plaintiff's FDCPA Claims

"[T]he FDCPA was enacted in order to eliminate abusive debt collection practices, which contribute to the number of personal bankruptcies, marital instability, loss of employment, and invasions of privacy." Caprio v. Healthcare Revenue Recovery Grp., LLC, 709 F.3d 142, 148 (3d Cir. 2013) (citing 15 U.S.C. § 1692(a), (e)).  The "legislation was [also meant] to insure that those debt collectors who refrain from using such practices are not competitively disadvantaged." Id. (citing 15 U.S.C. § 1692(e)).  "As remedial legislation, the FDCPA must be broadly construed in order to give full effect to these purposes." Id.

"'[L]ender-debtor communications potentially giving rise to claims under the FDCPA . . . should be analyzed from the perspective of the least sophisticated debtor.'" Rosenau v. Unifund Corp., 539 F.3d 218, 221 (3d Cir. 2008) (quotation marks omitted).  "This standard is lower than the standard of a reasonable debtor." Id.  "[W]hile the least sophisticated debtor standard protects naive consumers, 'it also prevents liability for bizarre or idiosyncratic interpretations of collection notices by preserving a quotient of reasonableness and presuming a basic level of understanding and willingness to read with care.'" Brown v. Card Serv. Ctr., 464 F.3d 450, 454 (3d Cir. 2006) (quoting Wilson v. Quadramed Corp., 225 F.3d 350, 354-55 (3d Cir. 2000)).

### A.    A Genuine Dispute of Material Fact Exists Regarding Whether Bank of America Used a False Name

Defendant Bank of America argues that it is not governed by the FDCPA because it is a creditor, not a debt collector.[2]  (Doc. No. 46, at 12-16.)  Plaintiff responds that Bank of America

---

[2] We note that Bank of America's representative stated in her deposition that she believes that Bank of America is the servicer of Plaintiff's loan and that Freddie Mac owns the debt.  (Doc. No. 59-18, at 50-51 (Orriss Dep. 196:25-197:11).)  The parties have not briefed the Court on whether this fact is disputed or how it changes the false name analysis.

is a "debt collector" because "its conduct fits within the parameters of the [FDCPA's] 'false name' exception." (Doc. No. 59, at 7-10 (emphasis omitted).)

The FDCPA defines a "debt collector" as "any person who uses any instrumentality of interstate commerce or the mails in any business the principal purpose of which is the collection of any debts, or who regularly collects or attempts to collect, directly or indirectly, debts owed or due or asserted to be owed or due another." 15 U.S.C. § 1692a(6). While the FDCPA generally excludes "creditors" from its coverage, it regulates the conduct of "any creditor who, in the process of collecting his own debts, uses any name other than his own which would indicate that a third person is collecting or attempting to collect such debts." 15 U.S.C. § 1692a(6).[3] "'Because creditors are generally presumed to restrain their abusive collection practices out of a desire to protect their corporate goodwill, their debt collection activities are not subject to the Act unless they collect under a name other than their own.'" Pollice v. Nat'l Tax Funding, L.P., 225 F.3d 379, 403 (3d Cir. 2000) (quoting Aubert v. Am. Gen. Fin., Inc., 137 F.3d 976, 978 (7th Cir. 1998)).

The Third Circuit has not addressed the false name exception in depth. However, we find a recent Second Circuit decision to be instructive. In Vincent v. Money Store, 736 F.3d 88, 97-98 (2d Cir. 2013), the court addressed the issue of "whether the false name exception can be invoked when the creditor uses the name of an actual, non-affiliated third-party to collect its debts." Analyzing the statute's text, the court concluded that "three elements . . . must be satisfied before deeming a creditor a debt collector pursuant to the false name exception: (1) the creditor is collecting its own debts; (2) the creditor 'uses' a name other than its own; and (3) the

---

[3] Section 1692e(14) provides that "[t]he use of any business, company, or organization name other than the true name of the debt collector's business or company" constitutes a violation of the FDCPA." Hutt v. Albert Einstein Med. Ctr., No. 04-03440, 2005 WL 2396313, at *7 (E.D. Pa. Sept. 28, 2005) (quoting 15 U.S.C. § 1692e(14)).

9

creditor's use of that name falsely indicates that a third person is 'collecting or attempting [to] collect' the debts that the creditor is collecting." Id. at 98.  Giving the word "use" its ordinary meaning, the court found that "there must be some active involvement in the misrepresentation by the creditor before triggering liability under the false name exception." Id. at 99.  The Vincent court gave examples of how the latter two elements could be satisfied: "(1) the creditor uses a name that falsely implies that a third party is involved in collecting its debts; (2) the creditor pretends to be someone else; or (3) the creditor uses a pseudonym or alias." Id. at 98.

      Here, we find that a genuine dispute of material fact prevents summary judgment for Defendant Bank of America.  Bank of America contracted with Urban Lending Solutions, the parent company of Walled Lake, to generate the Borrower Response Packages.  (Doc. No. 59-11, at 12 (Ralston Dep. 43:16-25).)  Thus, although the Borrower Response Package states that it comes from Walled Lake, Walled Lake's representative denied that the company mailed the Borrower Response Package to Plaintiff, id. at 31 (Ralston Dep. 117:5-119:14), and it is unclear whether its personnel made calls to Plaintiff or spoke with her on the phone, id. at 28 (Ralston Dep. 107:7-20).  Bank of America's representative testified that, from her perspective, it is Bank of America that sends the Borrower Response Package.  (Doc. No. 59-18, at 48 (Orriss Dep. 187:5-188:9).)  The touchstone in the false name inquiry is deception.  See Vincent, 736 F.3d at 99; see also White v. Goodman, 200 F.3d 1016, 1018 (7th Cir. 2000) ("[If] the third party is participating in the debt collection, . . . then there is no deception.").  A reasonable jury could find that Bank of America's use of a corporate entity's name, when the record reflects that the corporate entity may not have actually communicated with Plaintiff, is a false use that subjects Bank of America to liability under the FDCPA.  Thus, we deny Bank of America's summary judgment motion on this issue.

B.  A Genuine Dispute of Material Fact Exists Regarding Whether Bank of America and Walled Lake Were Engaged in Collecting a Debt

Defendants argue that they sent the Borrower Response Package, e-mailed, and called Plaintiff in an effort to communicate to her that she had loan modification options, and therefore were not engaged in debt collection. (Doc. Nos. 46, at 16-20 & 45, at 20-24.) Specifically, Bank of America and Walled Lake argue that they never asked Plaintiff for money, and that Walled Lake was not engaged to attempt to persuade borrowers to modify their loans. (Id.) Plaintiff argues in response that by stating that Plaintiff was behind in her mortgage, Defendants implicitly asked her for money. (Doc. No. 59, at 14-20.)

In this case, Defendants' arguments that loan modification is distinct from debt collection are not persuasive. A home loan is a debt. See Allen ex rel. Martin v. LaSalle Bank, N.A., 629 F.3d 364, 365, 368-69 (3d Cir. 2011). And offers to alter the amount of debt due, which could be dubbed "loan modification" as they are in this case, fall within the purview of the FDCPA. Cf. id. (plaintiff homeowner brought FDCPA claim where the defendant bank declared homeowner in default after she failed to make the last payment on her 30 year mortgage). Bank of America's representative agreed that a mortgage is a debt, Doc. No. 59-18, at 50-51 (Orriss Dep. 196:25-197:11), so it follows that restructuring the way the debt is paid is a form of debt collection. Further, Walled Lake holds debt collection licenses in every state where it engages in business and such a license is required, Doc. No. 59-11, at 10 (Ralston Dep. 36:5-17); a reasonable jury could find that these licenses are not superfluous to its business purpose and activities. While Bank of America's approach is more subtle than screaming "give me your money," a reasonable jury could find that its goal is nonetheless related to collecting a debt. Campuzano-Burgos v. Midland Credit Mgmt., Inc., 550 F.3d 294, 300 (3d Cir. 2008) (noting that the defendant's letters did not demand money from the plaintiff); Simon v. FIA Card Servs.,

11

N.A., 732 F.3d 259, 265-66 (3d Cir. 2013) (same). Thus, we find that Defendants are not entitled to summary judgment on this basis.[4]

    C.  A Genuine Dispute of Material Fact Exists Regarding Whether Bank of America Prevails with a Bona Fide Error Defense

Bank of America argues that it is entitled to summary judgment under the FDCPA's bona fide error defense. (Doc. No. 46, at 23-26.) Citing its policy related to posting customer payments, Bank of America argues that it prevails under the bona fide error defense because it had a policy in place, the policy was reasonable to prevent errors, and a bona fide error caused the incorrect indication on Plaintiff's account that she was in arrears with her payments. (Id.) In response, Plaintiff argues that Bank of America had no policy in place that would prevent Walled Lake from calling customers once they had opted out of loan modification communications with Bank of America. (Doc. No. 59, at 21-24.)

To prevail under the bona fide error defense provision in the FDCPA, a defendant must show that "(1) the alleged violation was unintentional, (2) the alleged violation resulted from a bona fide error, and (3) the bona fide error occurred despite procedures designed to avoid such errors." Beck v. Maximus, Inc., 457 F.3d 291, 297-98 (3d Cir. 2006). The alleged violation

---

[4] We are unpersuaded by Bank of America's argument that because its 32 phone calls to Plaintiff's former employer all went to an answering machine, she cannot recover for those phone calls under § 1692d. (Doc. No. 46, at 20-23.) Although the record indicates that Plaintiff was unaware of these 32 phone calls, Doc. No. 59-7, at 33 (Pl.'s Dep. 128:2-17), a reasonable jury could determine that the "natural consequence" of the volume and frequency of Bank of America's calls was to "harass, oppress, or abuse" Plaintiff, especially given that the calls were placed to her former employer. 15 U.S.C. § 1692d; Shand-Pistilli v. Prof'l Account Servs., Inc., No. 10-01808, 2011 WL 2415142, at *4-5 (E.D. Pa. June 16, 2011) ("Intent to annoy, abuse, or harass may be inferred from the frequency of phone calls, the substance of the phone calls, or the place to which phone calls are made." (quotation marks omitted)); Regan v. Law Offices of Edwin A. Abrahamsen & Assocs., P.C., No. 08-5923, 2009 WL 4396299, at *6 (E.D. Pa. Dec. 1, 2009) ("Although summary judgment may be appropriate where the specific conduct at issue unequivocally has—or does not have—the natural consequence of harassing, oppressing, or abusing the consumer as a matter of law, the court cannot say as a matter of law that either is true of the communications at issue in this case.").

"must have been 'unintentional' and must have 'resulted from a bona fide error notwithstanding the maintenance of procedures reasonably adapted to avoid such error.'" Id. at 297 (quoting 15 U.S.C. § 1692k(c)). Here, we find that genuine disputes of material fact preclude summary judgment on Bank of America's bona fide error defense. With respect to the second prong of the defense, a reasonable jury could find that one or more of a string of errors led to Plaintiff's inclusion in the loan modification program, including the payment of two homeowners insurance policies and the multiple failures of Bank of America personnel to preemptively or retroactively remedy the deficit showing on Plaintiff's account. See Adams v. Law Offices of Stuckert & Yates, 926 F. Supp. 521, 529 (E.D. Pa. 1996) ("The debt collector must have in place some ongoing policy that operates to detect, correct and prevent errors."); cf. Dutton v. Wolpoff & Abramson, 5 F.3d 649, 657-58 (3d Cir. 1993) (discussing jury's role in FDCPA cases). Depending on the error or errors that the jury finds occurred, the jury could also reasonably find that the posting policy procedure was not "reasonably adapted to avoid" those errors. See Adams, 926 F. Supp. at 529. Also, it is disputed whether the deficiency showing on Plaintiff's account was fixed in early August or early September, Doc. Nos. 48-21 & 59-13, at 3; if the problem was corrected in early August, it becomes even less clear what caused Plaintiff's inclusion in the loan modification program. See Rush v. Portfolio Recovery Assocs. LLC, — F. Supp. 2d —, 2013 WL 5645770, at *9-10 (D.N.J. Oct. 17, 2013). Thus, we find that Bank of America is not entitled to summary judgment on this issue.

IV.	Plaintiff's UTPCPL Claims

A.	Defendants Are Entitled to Summary Judgment on Plaintiff's UTPCPL Claims Because Plaintiff Has Not Shown Justifiable Reliance That Led to Ascertainable Loss

Defendants argue that Plaintiff's UTPCPL claim fails because she has not shown justifiable reliance or that she suffered an ascertainable loss.[5] (Doc. Nos. 46, at 27-32 & 45, at 26-30.) Plaintiff argues in response that she justifiably relied on Defendants' misconduct, prompting her to visit a lawyer, and that she suffered an ascertainable loss when she paid for street parking during that visit and cab fares to and from her deposition. (Doc. No. 59, at 24-32.)

The UTPCPL prohibits any person from engaging in "[u]nfair methods of competition and unfair or deceptive acts or practices in the conduct of any trade or commerce." 73 Pa. Stat. § 201-3. The Act provides a non-exhaustive list of unfair trade practices that the Act specifically prohibits as well as a "catch-all" provision which broadly prohibits "[e]ngaging in any other fraudulent or deceptive conduct which creates a likelihood of confusion or of misunderstanding." Id. § 201-2(4). "[The Pennsylvania] Supreme Court has stated courts should liberally construe

---

[5] Because we find that Plaintiff has not shown the requisite causal nexus between Defendants' misconduct and an ascertainable loss that she suffered, we do not address in depth Defendants' other arguments that: (1) the UTPCPL should be interpreted to include the Fair Credit Extension Uniformity Act's exemption for purchase money mortgages, Doc. No. 46, at 32-33; (2) Plaintiff must show all the elements of common law fraud to prevail under the catch-all provision of the UTPCPL, id. at 27; (3) Plaintiff lacks standing to bring a UTPCPL claim, Doc. No. 45, at 24-25; and (4) Walled Lake did not engage in fraud or deception, id. at 25-26.

We note briefly, however, that Walled Lake's argument that Plaintiff lacks standing is misplaced because Plaintiff purchased Bank of America's home loan services. See In re Smith, 866 F.2d 576, 582 (3d Cir. 1989) ("We hold that the scope of section 9.2 is not limited to the initial mortgage agreement only, but includes transactions and dealings between the parties during the life of the mortgage.") We also find Walled Lake's argument that it can escape liability because it did not sell goods or services directly to Plaintiff to be unpersuasive because the UTPCPL's text does not lead to such a narrow construction. See id.; Valley Forge Towers S. Condo. v. Ron-Ike Foam Insulators, Inc., 574 A.2d 641, 646 (Pa. Super. Ct. 1990), aff'd without opinion, 605 A.2d 798 (Pa. 1992) ("[UTPCPL] case law . . . weighs heavily against implying a strict technical privity requirement in the cause of action authorized by 73 P.S. § 201-9.2.")

14

the UTPCPL in order to effect the legislative goal of consumer protection." Fazio v. Guardian Life Ins. Co. of Am., 62 A.3d 396, 405 (Pa. Super. Ct. 2012) (quotation marks omitted), appeal denied, 72 A.3d 604 (Pa. 2013).

The state of the law in Pennsylvania regarding what elements are required to prove a case under the UTPCPL's catch-all provision is "in flux." Belmont v. MB Inv. Partners, Inc., 708 F.3d 470, 498 (3d Cir. 2013) (quotation marks omitted). Although the Superior Court has recently stated that a Plaintiff need not prove justifiable reliance, see, e.g., Grimes v. Enter. Leasing Co. of Phila., LLC, 66 A.3d 330, 337 n.4 (Pa. Super. Ct. 2013), appeal granted in part, — A.3d —, 2014 WL 349263 (Pa. Jan. 30, 2014),[6] we find the Third Circuit and Pennsylvania Supreme Court's prior holdings, which require justifiable reliance, to be more persuasive, see, e.g., Yocca v. Pittsburgh Steelers Sports, Inc., 854 A.2d 425, 438 (Pa. 2004). The Third Circuit explains that the justifiable reliance prong is based on the Act's standing provision, as opposed to the text of the catch-all provision. Hunt v. U.S. Tobacco Co., 538 F.3d 217, 222 (3d Cir. 2008) ("The Supreme Court of Pennsylvania has consistently interpreted the Consumer Protection Law's private-plaintiff standing provision's causation requirement to demand a showing of justifiable reliance, not simply a causal connection between the misrepresentation and the harm."). An ascertainable loss means a "loss of money or property," not an emotional loss.

---

[6] The Pennsylvania Supreme Court granted review based on two issues:
    1. Whether the Superior Court erred when it held that a private plaintiff who alleges deceptive conduct under the UTPCPL's "catch-all" provision, 73 P.S. § 201–2(4)(xxi), need not allege and prove justifiable reliance . . . .
    2. Whether the Superior Court erred when it held that a plaintiff may satisfy the UTPCPL's "ascertainable loss" requirement by voluntarily hiring an attorney and allegedly incurring litigation costs to challenge allegedly wrongful conduct, even where, as here, the plaintiff paid no money to the defendant as a result of that conduct.
Grimes v. Enter. Leasing Co. of Phila., — A.3d —, 2014 WL 349263, at *1 (Pa. Jan. 30, 2014).

Agliori v. Metro. Life Ins. Co., 879 A.2d 315, 319 (Pa. Super. Ct. 2005) (quoting 73 P.S. § 201-9.2(a)); Sarsfield v. Citimortgage, Inc., 707 F. Supp. 2d 546, 559 n.6 (M.D. Pa. 2010).

Here, Plaintiff has proffered no evidence that could serve as the basis for a reasonable jury to conclude that her out-of-pocket expenses were a result of her justifiable reliance on either Defendant's deceptive conduct. Lynch v. Capital One Bank (USA), N.A., No. 12-992, 2013 WL 2915734, at *4-5 (E.D. Pa. June 14, 2013). Plaintiff has not met her burden of showing actual losses because, although she spent money on parking and transportation,[7] the evidence of record does not show that her losses were "a result of," or in justifiable reliance on, either Defendant's fraudulent or deceptive statements. 73 Pa. Stat. § 201-9.2; Sexton v. PNC Bank, 792 A.2d 602, 607-08 (Pa. Super. Ct. 2002) (dismissing complaint for lack of allegation that Plaintiff justifiably relied on any deceptive conduct by defendant); see Perry v. Capital One, No. 2:11-CV-27, 2012 WL 645938, at *2-3 (E.D. Pa. Feb. 29, 2012); Belmont v. MB Inv. Partners, Inc., 708 F.3d 470, 499 (3d Cir. 2013). At her deposition, Plaintiff testified that she went to her lawyer to "make this stop." (Doc. No. 59-7, at 9 (Pl.'s Dep. 30:21-31:11).) Plaintiff testified that she sought the assistance of a lawyer to stop Defendants from calling her; however, the act of placing a phone call is not fraudulent or deceptive. Compare Grimes, 66 A.3d at 339 ("[A plaintiff is] not required under the UTPCPL to sit idly by and wait for [the defendant] to collect $840.42 from her in order to assert her rights and attempt to stop [the defendant's] alleged deceptive trade practices.").[8]

---

[7] Although the Amended Complaint states that Plaintiff remitted an allegedly unnecessary mortgage payment to Bank of America, in her Response, Plaintiff does not argue that that payment is an ascertainable loss to her. (See Doc. Nos. 15, at ¶ 41 & 59, at 27-31.)
[8] Although this holding is on appeal before the Pennsylvania Supreme Court, we cite it to show that Plaintiff's showing of justifiable reliance and ascertainable loss fails even under the most expansive reading of the doctrine that we could find from a Pennsylvania appellate court.

Plaintiff did not testify that she sought out a lawyer to avoid foreclosure or because she wanted to fight Defendants' false demands for money; instead, her testimony is consistent with the Amended Complaint, which states that Plaintiff did not fall behind in her mortgage payments, Doc. No. 15, at ¶¶ 22-25. Compare In re Actiq Sales & Mktg. Practices Litig., 790 F. Supp. 2d 313, 328-29 (E.D. Pa. 2011) (holding that the plaintiff may have made drug payments in justifiable reliance on the defendant's statements about the drug). Although her testimony does indicate that Plaintiff was initially confused about whether her home was in foreclosure, Doc. No. 59-7, at 18 (Pl.'s Dep. 66:23-67:14), she did not state that it was confusion or a fear of losing her home that prompted her to see a lawyer; arguments to the contrary in Plaintiff's response are the product of an advocate's gloss. Plaintiff's testimony is consistent with the facts that a month had passed since receiving the first Borrower Response Package and Plaintiff had been assured multiple times by Bank of America personnel that her mortgage was not in default. (See Doc. Nos. 59-7, at 9, 18-19 (Pl.'s Dep. 31:2-8, 66:23-71:7) & 48-21, at 9.) Because there is no genuine dispute of material fact and Defendants are entitled to judgment as a matter of law, we grant Defendants summary judgment on Plaintiff's UTPCPL claim.

IV. Conclusion

For the reasons set forth above, we grant in part and deny in part Defendants' motions for summary judgment.

BY THE COURT:

/s/ Legrome D. Davis

Legrome D. Davis, J.